735 P.2d 998

**ENVIROSAFE SERVICES OF IDAHO, INC., a Delaware corporation, Plaintiff-Respondent,**

v.

**The COUNTY OF OWYHEE, a political subdivision of the State of Idaho; and the Board of County Commissioners of Owyhee County, Donald L. Davis, James W. Purdom, and Richard Bass, members of the Board of County Commissioners, Defendants-Appellants.**

No. 16327.

Supreme Court of Idaho.

March 24, 1987.

William Alex Fuhrman (argued), and James J. Davis (appeared), Boise, for defendants-appellants.

Chas. F. McDevitt (argued), and Kenneth R. McClure (appeared), Boise, for plaintiff-respondent.

HUNTLEY, Justice.

Owyhee County appeals the trial court's writ of prohibition and order prohibiting it from enforcing its Ordinance No. 83-02, wherein the county sought to regulate the disposal of hazardous and non-hazardous wastes and materials (including polychlorinated biphenyls (PCBs)) and establish user fees.

On April 9, 1984, the Owyhee County Board of Commissioners enacted "the third amended Owyhee County Catastrophic and Emergency Preparedness Hazardous Waste and Materials Disclosure and Fee Ordinance" (hereinafter Ordinance No. 83-02). The ordinance adopted standards delineated in the Resource Conservation Recovery Act (RCRA) 42 U.S.C. § 6901 et seq., and Toxic Substance Control Act (TSCA), 15 U.S.C. § 2601 et seq., which included requiring the operators of hazardous waste facilities in Owyhee County to file disclosure forms indicating truck delivery routes, the kinds of wastes and materials received, and the names of the generators of the waste. A fee of one cent per pound of waste deposited in the county was also imposed. Enforcement was by civil penalty. The ordinance was directed at Envirosafe Services of Idaho, Inc. (ESI),

the plaintiff/respondent in this case, which operates two hazardous waste management facilities in Owyhee County.

Pursuant to the ordinance, Owyhee County collected $574,144.13 in fees from ESI, which were subsequently paid to a district court trust account for the duration of the district court deliberations. Those deliberations began after August 21, 1984, on which date ESI filed an application for alternative and preemptory writs of prohibition, requesting that the county be prohibited from enforcing the ordinance and that all fees paid to the county pursuant to the ordinance be reimbursed.

The trial court found that the Idaho Legislature, by enacting the Hazardous Waste Management Act of 1983 (HWMA), I.C. §§ 39-4401-4432, intended to fully occupy the field of hazardous waste disposal and, thus, Ordinance No. 83-02 was preempted by state law and void.[1] The trial court also found the provisions of Ordinance 83-02 regarding PCB disposal to be preempted by the HWMA and state regulations.

While PCB disposal at ESI has been regulated by the state through a "conditional use permit" pursuant to the Idaho Environmental Protection and Health Act of 1972 (Title 39, Chapter 1, I.C.) and regulations adopted by the Board of Health and Welfare pursuant to I.C. § 39-108, the trial court found the pervasiveness, complexity and language of the state regulations all evidenced clear intent on the part of the state to preempt political subdivisions of the state from enacting regulations concerning PCB disposal. The trial court also found that the subject matter of PCB disposal was unique, requiring regulation on a statewide basis.

## I. THE STANDARDS OF PREEMPTION ANALYSIS

Prior to any discussion of the merits of appellants' contention that the State has neither preempted the field of hazardous waste disposal, nor the field of PCB dispos-

---

1. The ordinance is virtually a verbatim copy of the Act.

al, a discussion of the salient standards governing such an analysis is appropriate.

The Idaho Constitution, art. 12, § 2, provides that county ordinances may not conflict with state statutes:

§ 2. **Local police regulations authorized.**—Any county or incorporated city or town may make and enforce, within its limits, all such local police, sanitary and other regulations as are not in conflict with its charter or with the general laws.

*See also, In re Ridenbaugh,* 5 Idaho 371, 49 P. 12 (1897). This grant of police power to local governments has been recognized and accorded respect by this Court:

[A] municipality, under the constitutional provision in question, [art 12, § 2] has authority to make police regulations not in conflict with general laws, co-equal with the authority of the legislature to pass general police laws. *Clyde Hess Distributing Co. v. Bonneville County,* 69 Idaho 505, 512, 210 P.2d 798, 801 (1949).

■ The concept of "conflict" broadens when put in the context of a determination of state preemption over a field of regulation. Of course, direct conflict (expressly allowing what the state disallows, and vice versa) is "conflict" in any sense. *State v. Musser,* 67 Idaho 214, 176 P.2d 199 (1946). Additionally, a "conflict" between state and local regulation may be implied. This state firmly adopted the doctrine of implied preemption in *Caesar v. State,* 101 Idaho 158, 610 P.2d 517 (1980).

Where it can be inferred from a state statute that the state has intended to fully occupy or preempt a particular area, to the exclusion of [local governmental entities], a [local] ordinance in that area will be held to be in conflict with the state law, even if the state law does not so specifically state. *Caesar, supra,* 101 Idaho at 161, 610 P.2d at 520. (*See also, United Tavern Owners of Philadelphia v. School District of Philadelphia,* [441 Pa. 274] 272 A.2d 868 (Pa.1971); *Boyle v. Campbell,* 450

S.W.2d 265 (Ky.1970); *In re Hubbard,* [62 Cal.2d 119, 396 P.2d 809] (Cal.1964).

The doctrine of implied preemption typically applies in instances where, despite the lack of specific language preempting regulation by local governmental entities, the state has acted in the area in such a pervasive manner that it must be assumed that it intended to occupy the entire field of regulation.

"The [local governmental entity] cannot act in an area which is so completely covered by general law as to indicate that it is a matter of state concern." *Caesar,* 101 Idaho at 161, 610 P.2d at 520.

Other jurisdictions have commonly found that the doctrine of implied preemption will also apply where uniform statewide regulation is called for due to the particular nature of the subject matter to be regulated.

[I]f the court finds that the nature of the subject matter regulated calls for a uniform state regulatory scheme, supplemental local ordinances are preempted. *Township of Cascade v. Cascade, Resource Recovery Inc.,* 118 Mich.App. 580, 325 N.W.2d 500, 502 (Mich.App.1982). (See also, *People v. Llewellyn,* 401 Mich. 314, 257 N.W.2d 902 (1977), cert. den., 435 U.S. 1008, 98 S.Ct. 1879, 56 L.Ed.2d 390 (1978).

Owyhee County argues that *Caesar, supra,* is an anomalous case which has been abrogated by more recent case law. Specifically, Owyhee County cites *Benewah County Cattlemen's Association, Inc. v. Board of County Commissioners of Benewah County,* 105 Idaho 209, 668 P.2d 85 (1983), as the more orthodox precedent. Any reliance by Owyhee County on *Benewah County, supra,* is misplaced. In that case, the doctrine of implied preemption was in no way abrogated. Rather, this Court simply could not find *any* intent to preempt by the legislature, since it had not occupied the field at issue (livestock control):

We hold that the herd district statutes were not intended to preempt, and do not preempt, the field of livestock regulations so as to preclude local regulation.

Herd district statutes which by their own terms are inapplicable to "open range" areas do not preempt the field of livestock control in such areas. *Benewah County*, 105 Idaho at 214, 668 P.2d at 90.

Moreover, the underpinnings for the doctrine of implied preemption are principles of long-standing in this state. In *Clyde Hess Distributing Co. v. Bonneville County*, 69 Idaho 505, 210 P.2d 798 (1949), this Court acknowledged the ability of the legislature to implicitly preempt local regulation by occupying the field of regulation. In that case, we found that the legislature "did not intend to occupy the whole field of hours of sale of beer, thereby making any regulation by the county necessarily inconsistent with the general law." *Clyde Hess*, 69 Idaho at 510, 210 P.2d at 800. Our failure to find the field preempted in *Clyde Hess* was due to the fact that *express* intent not to preempt was found in the *same* statute which had been alleged to preempt the field. (I.C. §§ 23–1014–15). (See also, *State v. Poynter*, 70 Idaho 438, 220 P.2d 386 (1950).

With these standards in mind, we turn now to the case at hand.

## II. THE FIELD OF HAZARDOUS WASTE DISPOSAL

■ The HWMA contains no express language indicating intent to preempt local regulation; nor does it expressly grant to localities the right to regulate. However, I.C. § 39–4404 provides:

The legislature intends that the State of Idaho enact and carry out a hazardous waste program that will enable *the state* to assume primacy over hazardous waste control from the federal government.... By the provisions of this chapter, the legislature desires to avoid the existence of duplicative, overlapping or conflicting state and federal regulatory systems.... (Emphasis added).

I.C. § 39–4405 further provides that the Board of Health and Welfare "adopt such rules and regulations as are necessary and feasible for the management of post generation handling, collection, transportation, treatment, storage and disposal of hazard-

ous wastes *within the state.*" (Emphasis added).

Importantly, I.C. § 39–4419 reads:

The director [of the Idaho Department of Health and Welfare] shall have the power and the duty to encourage cooperative activities between the department and other states for the improved management of hazardous wastes, and so far as is practical, *to provide for uniform state regulations* and for interstate agreements relating to hazardous waste management. (Emphasis added).

All of the above-cited code sections evince a strong legislative intent that regulation of the field of hazardous waste disposal be regulated by means of one, uniform statewide scheme enabling this state to enter into meaningful interstate agreements. Taken alone, this clear legislative intent is more than sufficient to preempt the field and preclude local governmental regulation of the subject matter.

However, even were such not the case, the HWMA, in and of itself, is a comprehensive statutory scheme of the kind which implicitly evidences legislative intent to preempt the field. The HWMA provides for regulation, trip permits and a manifest system for those who transport hazardous waste (I.C. §§ 67–2929–30 and I.C. § 39–4410); it further regulates a permit system for hazardous waste facilities (I.C. § 39–4409) and provides recording and reporting requirements for generators and facilities (I.C. § 39–4411, 39–4429); fee systems and dedicated funds for emergency responses, and monitoring (I.C. §§ 39–4417, 4410 and 39–4427) are also provided. There are also code sections dealing with citizen suits (I.C. § 39–4416), local governmental notice (I.C. § 39–4418), interstate cooperation (I.C. § 39–4419), employment security (I.C. § 39–4420), as well as broad enforcement provisions (I.C. § 39–4413).

The HWMA speaks for itself. This state's legislature has acted in an all-encompassing fashion towards regulating the field of hazardous waste disposal. Such is also readily apparent from a reading of the ordinance. Ordinance 83–02 is largely du-

plicative of the HWMA. In fact, the county itself concedes that the bulk of Ordinance 83–02 is entirely duplicative of the HWMA and, necessarily, the RCRA. Such extensive duplication leads to the inescapable conclusion that the area has already been fully regulated and the fields sought to be covered by the ordinance already occupied by the HWMA.

Paradoxical as it may seem, it is apparent that an ordinance and a statute may be identical under this rule and yet the ordinance is invalid because within the constitutional provision it is in conflict with the statute.... Where a statute and an ordinance are identical it is obvious that the field sought to be covered by the ordinance has already been occupied by state legislation. *Pipoly v. Benson*, [20 Cal.2d 366] 125 P.2d 482, 485 (Cal.1942). (*See also, Cohen v. Board of Supervisors*, [219 Cal.3d 277, 219 Cal. Rptr. 467, 474] 707 P.2d 840, 847 (Cal. 1985); *Lancaster v. Municipal Court*, [6 Cal.3d 805, 100 Cal.Rptr. 609] 494 P.2d 681 (Cal.1972).

Most importantly, we also note that the very subject matter here involved, the field of hazardous waste disposal, is fraught with such unique concerns and dangers to both the state and the nation that its regulation demands a statewide, rather than local, approach. We are not the only state to so decide. In *Stablex Corp. v. Town of Hooksett*, 122 N.H. 1091, 456 A.2d 94 (1982), the Town of Hooksett enacted ordinances regulating the siting and construction of hazardous waste facilities. The New Hampshire Supreme Court noted that "state and federal hazardous waste legislation was ... enacted against a background that can only be termed a state and national emergency...." *Stablex*, 456 A.2d at 96. That court further concluded that the New Hampshire state statutes regulating hazardous waste comprised a "comprehensive and detailed program of statewide regulation" which preempted any local action in the field. (*See also, Applied Chemical Technology, Inc. v. Town of Merrimack*, 126 N.H. 45, 490 A.2d 1348 (1985).

Equally compelling and nearly identical reasoning was employed in *Township of*

*Cascade v. Cascade Resource Recovery Inc.*, 118 Mich.App. 580, 325 N.W.2d 500 (1982).

[T]he safe management and disposal of hazardous wastes is clearly an area which demands uniform, statewide treatment.... Michigan is extremely limited in the number of facilities that handle this waste properly. This is due partly because no community wants hazardous waste facility in its vicinity. Thus, local interests strongly want to retain their control. However, the same reasoning easily justifies state control. The legislature recognized that hazardous waste disposal areas evoke such strong emotions in localities that the decision as to where a landfill should go should not be given to the locality, which is far more swayed by parochial interests than the state. The legislature, instead, gave the power to a centralized decisionmaker who could act uniformly and provide the most effective means of regulating hazardous waste. 325 N.W.2d at 504.

It is important to note that the same considerations which permeated the holding in *Township of Cascade* are equally applicable here. The state of Idaho is limited to very few facilities which handle hazardous waste. Additionally, the treatment and storage of hazardous waste is a subject which inspires a unique amount of interest and concern from this state's citizenry. We recognize the unique importance of and benefit derived from local government regulation and that, ordinarily, local problems are best solved by local regulation, since local governmental entities are uniquely suited to fashioning workable solutions by virtue of their proximity to, and direct awareness of, the issues involved. By our ruling here, we in no way denigrate the function of local government. Instead, we acknowledge the unique importance and complexity of the subject matter. (See also, *Rollins Environmental Services of Louisiana Inc. v. Iberville Parish Police Jury*, 371 So.2d 1127 (La.1979)).

The county cites several authorities which suggest that the subject matter of hazardous waste regulation does not neces-

sarily lend itself to a finding of preemption of local regulation. We find those authorities either unpersuasive in view of the concerns already articulated, or inapplicable due to the jurisdiction's non-use of the doctrine of implied preemption. *Fondessy Enterprises v. City of Oregon*, 23 Ohio St.3d 213, 492 N.E.2d 797 (1986) (holding that municipal regulation of a hazardous waste facility was permitted as it did not conflict with state law, but defining "conflict" by stating "the test is whether the ordinance permits or licenses that which the statute forbids and prohibits and vice versa." 492 N.E.2d at 801); *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616 (W.Va.1985) (holding based on the unique status and import given that state's common law cause of action for nuisance); *Sunny Farms Ltd. v. North Cordorus Township*, 81 Pa.Cmwlth. 371, 474 A.2d 56 (1984); *State v. City of Klamath Falls*, 68 Or.App. 148, 682 P.2d 779, review denied, 297 Or. 781, 687 P.2d 796 (1984) (giving little or no credence to the concept of implied preemption).

For the reasons stated, the trial court correctly found the field of hazardous waste disposal is uniquely susceptible of, and appropriate for, uniform statewide regulation, which regulation has, in fact, been effected through the provisions of the HWMA rendering Ordinance 83–02 void.

## III. THE FIELD OF PCB DISPOSAL

■ Although PCBs have not been specifically identified as "hazardous waste" by the State Department of Health and Welfare and are not identified as "hazardous waste" in the RCRA, upon which this state's HWMA is patterned, their regulation has not been ignored by this state. Last year, the legislature enacted House Bill 660, 1986 Sess. Law, ch. 324, amending I.C. § 39–4403 and defining "restricted hazardous waste" to include "liquid hazardous wastes containing polychlorinated biphenyls at concentrations greater than or equal to fifty parts per million...." (I.C. § 39–4403(14)(a)(iv). Implicit in such a definition is the concept of PCBs as "hazardous waste," which concept lends credence to the argument that the legislature has

intended that PCBs be regulated via the HWMA.

Also of import is the fact that Idaho's definition of "hazardous waste" is broader than that found in the RCRA (42 U.S.C. § 6903(5)). I.C. § 39–4403(7) defines "hazardous waste" as:

[A] waste or combination of wastes of a solid, liquid, semi-solid, or contained gaseous form which, because of its quantity, concentration or characteristics (physical, chemical or biological) may: (a) Cause or significantly contribute to an increase in deaths or an increase in serious, irreversible or incapacitating reversible illnesses; or (b) Pose a substantial threat to human health or to the environment if improperly treated, stored, disposed of, or managed. Such wastes include, but are not limited to, materials which may have mutagenic, teratogenic or carcinogenic properties....

The specific language "materials which may have mutagenic, teratogenic·or carcinogenic properties" has no counterpart in the RCRA, but is found in the TSCA. That PCBs are included in this definition of "hazardous waste," taken from the TSCA, is evidenced from the listing of PCBs in 40 C.F.R. § 261 (Appendix VIII "Hazardous Constitutions,") which includes *only* "toxic, carcinogenic, mutagenic or teratogenic" substances. Therefore PCBs are, indeed, included in the definition of "hazardous waste" under the HWMA. Accordingly, our analysis, in Part I herein, of preemption of the subject matter is wholly applicable to the narrower field of PCB disposal.

Further evidencing this state's strong intent to fully regulate the disposal of PCBs are the Department of Health and Welfare's solid waste management regulations, 16 IDAPA 1–6001–6014, wherein authority to regulate PCBs through "conditional use permits" is granted. These regulations, in and of themselves, "have the force and effect of law." I.C. § 39–107(8). The regulations evidence intent that the Department of Health and Welfare and not, implicitly, other governmental entities, has primacy over such regulation. "Solid

wastes and post-consumer products shall be managed *as determined by the department, . . . ."* 16 IDAPA § 1–6004.01 (emphasis added).

The regulations are, themselves, comprehensive and evince a textually demonstrable commitment by the state to regulate the field uniformly on a statewide basis. Conditional use permits may be issued only when an administrator has reviewed "plans, maps, specifications" and has received a report on operational procedure for all disposal sites. 16 IDAPA § 1–6005.-01(b). Additionally, and importantly, 16 IDAPA § 1–6006.01(e) provides a limited role for local government in the process leading to the issuance of a conditional use permit. By so providing, the regulations indicate both the reality of state primacy in the field and the need for uniformity of regulation.

There is a substantial line of authority supporting our holding. *Rollins Environmental Services, Inc. v. Township of Logan,* 209 N.J.Super. 556, 508 A.2d 271 (1986) (holding that PCBs were "hazardous waste which was solid waste" and that that state's legislature had preempted the field of solid waste management due to pervasiveness of regulation); *Michigan Disposal, Inc. v. Township of Augusta,* 89 Mich. App. 557, 280 N.W.2d 596 (1979); *O'Connor v. City of Rockford,* 52 Ill.2d 360, 288 N.E.2d 432 (1972); *Ringlieb v. Township of Parsippany-Troy Hills,* 59 N.J. 348, 283 A.2d 97 (1971) (holding the nature of the subject-matter required state-wide control and pervasive regulation had preempted local regulation).

Owyhee County argues that it has concurrent authority, by way of I.C. § 31–4406, to regulate solid waste disposal systems and, therefore, PCBs. I.C. § 31–4406 provides that "the board of county commissioners shall by ordinance provide for the necessary rules and regulations for the operation and maintenance of solid waste disposal systems." However, I.C. § 31–4406 does not provide a basis for county authority to regulate regarding PCBs. That code section was never intended to include PCBs under its definition of "solid waste." That

code section was enacted in 1970, at a time when the hazards inherent in PCBs were little known. Additionally, this state's solid waste legislation, also enacted in 1970, echoes the federal Solid Waste Disposal Act, tit. 2, Public Law 89–272, 79 Stat. 992, enacted in 1965, at a time when the definition of "solid waste" was much less expansive than at present. I.C. § 31–4406 simply cannot serve as a basis for county regulation of PCBs.

For the foregoing reasons, we hold that the state has fully occupied and preempted both the fields of hazardous waste disposal and PCB disposal and, therefore, Ordinance No. 83–02 was properly voided by the trial court. Affirmed.

Costs to respondent. No attorney fees on appeal.

SHEPARD, C.J., and DONALDSON, BAKES and BISTLINE, JJ., concur.